UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>For Online Publication Only</u>

-----------------------------------------------------------------------X

ANTONIO RIVERA,

FILED
CLERK

3:44 pm, Aug 29, 2024

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

                                    Petitioner,

                    -against-

UNITED STATES OF AMERICA,

                                    Respondent.

-----------------------------------------------------------------------X

<u>**MEMORANDUM & ORDER**</u>
19-cv-05836 (JMA)
09-cr-00619 (JMA)

**AZRACK, United States District Judge:**

Petitioner Antonio Rivera ("Rivera" or "Petitioner"), proceeding <u>pro se</u>, moves to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. (Pet., ECF No. 533.) Petitioner alleges that he was denied his Sixth Amendment right to effective assistance of trial and appellate counsel when (1) trial counsel failed to object, on Confrontation Clause grounds, to the introduction of a letter written by co-defendant John Whaley after Whaley's arrest; (2) trial counsel failed to call alleged exculpatory witnesses; (3) trial counsel failed to move to dismiss the conviction based on the Ex Post Facto Clause and insufficient evidence; (4) appellate counsel failed to brief the Second Circuit on the application of the Supreme Court decision in <u>Elonis v. United States</u> to Petitioner's case; and (5) trial and appellate counsel failed to move to dismiss the conviction on the basis of constructive amendment of the Superseding Indictment. (Pet. at 13-51.) For the reasons set forth below, the Petition is DENIED.

## I.    BACKGROUND

The Honorable Sandra J. Feuerstein presided over Rivera's trial, sentencing, and subsequent resentencing. After Judge Feuerstein's passing in 2021, this case was transferred to the undersigned.

A.    **Trial, Conviction, and Sentencing**

In September 2009, Rivera was indicted on multiple charges of sex trafficking, forced labor, and transporting and harboring aliens. (Indictment, United States v. Rivera, No. 09-cr-619 (E.D.N.Y.), ECF No. 25.)  Thereafter, on October 5, 2010, Rivera, along with co-defendants, was further charged in a Superseding Indictment with the same and additional crimes.  (Superseding Indictment, ECF No. 88.)  Specifically, the Superseding Indictment "split" the charges related to sex trafficking and forced labor into two time periods: for the acts committed between July 1, 2005 and December 22, 2008, and for the acts committed between December 23, 2008 and August 10, 2009.  (Id.)  The latter were charged under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA").  (Id.)  All charges arose from Petitioner's operation of two Long Island bars named Sonidos de la Frontera ("Sonidos") and La Hija del Mariachi ("Mariachi").  (Id.; Presentence Investigation Report ("PSR") ¶¶ 75-76.)  Rivera and his co-defendants Jasmin Rivera ("Jasmin Rivera"), John Whaley, and Jason Villaman were all charged with recruiting undocumented immigrants to work as waitresses at the subject bars and forcing them to engage in commercial sex acts and other sexual contacts with the establishments' patrons. (Superseding Indictment ¶¶ 1-3.)

During a month-long jury trial[1], multiple witnesses testified to their experiences working at Rivera's bars from 2005 until August 2009, when the bars were shut down after they were raided by the Government.  Jasmin Rivera, Petitioner's sister and co-defendant, and Manuel Mejia, a security guard and a driver who worked for Rivera, testified as cooperating witnesses.[2]  (Trial Tr.

---

[1]     The jury trial commenced on April 26, 2011 and lasted until May 26, 2011.  Transcripts of the trial are available on PACER, (United States v. Rivera, No. 9-cr-619 (E.D.N.Y.), ECF Nos. 436, 437, 413-420, 424-432), and will be referenced throughout as "Trial Tr."

[2]     Both pled guilty to certain lesser charges: Jasmin Rivera pled guilty to sex trafficking conspiracy in violation of 18 U.S.C. § 371 and conspiracy to transport and harbor aliens in violation of 18 U.S.C. §§ 1324, 3551 et seq., (Trial Tr. at 765:23-766:2), and Mejia pled guilty to transporting an alien, (id. at 1318:20-21).

2

at 635-770, 773-77, 1316-62, 1366-1409.)   At trial, Petitioner was represented by Glenn A. Obedin, Esq.

The Government's theory at trial was that Petitioner, together with Jasmin Rivera and his co-defendants, used coercion and fraud, creating a "climate of fear" at both establishments, and forced vulnerable, undocumented women from Latin American countries to become heavily intoxicated and engage in sexual acts with the patrons in exchange for money, which were paid to Petitioner and his co-conspirators.  (See, e.g., Trial Tr. at 14-16, 1946:1-15.)

Evidence at trial showed that Sonidos and Mariachi "also functioned as illegal brothels." United States v. Rivera, 799 F.3d 180, 183 (2d Cir. 2015).  Defendants "advertised a decent salary and free transportation to and from work to recruit attractive, undocumented aliens to work in a role they described as 'waitress.'"  Id.  "The 'waitresses,' . . . were told they would be expected to dress suggestively, serve drinks, and possibly dance with customers."  Id.  However, after the victims began working at the bars, the defendants threatened them "with violence and deportation if they spoke to the authorities or quit, forced them to drink alcohol until they were intoxicated, required them to strip, and compelled them to be fondled by customers, to be groped by customers, and to have sex with customers."  Id.  There was also testimony at trial describing incidents in which Rivera, Whaley, and Villaman personally sexually assaulted and abused the waitresses. (See, e.g., Trial Tr. 887:17-889:11 (Rivera's sexual assault of "Sandra"), 1603:4-1607:13 (Rivera's multiple sexual assaults of "Florfidia"); Trial Tr. 618:5-23 (Whaley's sexual assault of "Alma"); Trial Tr. 800:5-801:16 (Villaman's participation in sexual assault on "Keiby")).

At trial, the jury heard testimony from the waitresses describing the conduct of Rivera and his co-conspirators.  For example, an undocumented woman from Honduras identified as "Nelci" provided extensive testimony about working in one of the bars from February 2006, when she was

only 17 years old, through January 2007.  (Trial Tr. at 169–280, 171-74.)  She explained that Petitioner, the owner of the bar, told her that the job at the bar would include serving drinks to customers and dancing with them "for a little while," and also that she "had a nice figure, and that [she] would make a lot of money with [her] figure."  (Id. at 174:7-75:8.)  Nelci explained how Petitioner was in charge of the bar, "called [her and others] to go to work" and set her work schedule.  (Id.)  She also described the scheme of how bar patrons were buying alcohol but, in reality, were paying Petitioner and Jasmin Rivera for sex with the waitresses.  (Id. at 194-95.)  She described the "rules" of the bar, i.e., that, if the police were called, the women were to say that they did not work at the bar, and that Petitioner was not the bar's owner.  (Id. at 195:2-14.)  The women themselves were prohibited from calling the police.  (Id. at 195.)  On one occasion, when Nelci tried calling the police after a fight erupted at the bar, Petitioner called her a "whore," an "immigrant," and a "wetback."  (Id. at 198:1-2.)  Petitioner constantly reminded the waitresses that they were immigrants without papers.  (Id. at 198:16-19, 214.)

Nelci explained that the waitresses were made to drink alcohol before and during work "in order to lose [their] shame [,] . . . be happier to be with the customers," and allow the customers to sexually touch them.  (Id. at 203.)  Even after Nelci became pregnant, she had to continue working, pretend to be drunk, and let customers "touch" her.  (Id. at 204-05.)  Nelci also witnessed men having sex with the drunk waitresses and Petitioner being paid for this.  (Id. at 222-23.)  She was also made to go to customers' houses almost every weekend, against her will, because Petitioner prostituted her to these customers.  (Id. at 225-26.)  When Nelci tried to complain, she was reminded that she was an immigrant.  (Id.)

Nelci testified that Petitioner wanted her to come back to work almost immediately after she gave birth and that he was angry at her for not doing so.  (Id. at 232-33.)  She further described

4

how when she tried to quit working at the bar, Petitioner came to her home and threatened her. (Id. at 215.)  Petitioner also sexually approached her on many occasions and told her that he had sex with another woman in the basement and made that woman cry.  (Id. at 216.)  Nelci described being sexually touched, without her consent, by Villaman, while she was pregnant.  (Id. at 219.) Nelci testified that she was finally able to leave the bar after saving some money, finding another place to live that was not known to Petitioner, and changing her phone number.  (Id. at 240.)

Multiple other witnesses—victims and other women who worked at the bars and had first-hand knowledge of the treatment to which the victims were subjected—provided similar accounts of events, describing their experience working at both bars at different times, spanning from 2005 through August 2009.  (See, e.g., id. at 354-92, 392-449, 777-865, 865-924, 930-48, 1019-65, 1069-65, 1069-1110, 1110-60, 1174-99, 1472-1517.)

One after another, the witnesses who worked at the bars provided similar testimony about Rivera and his co-defendants.  The victims testified, among other things, to the "job requirements" for the waitresses such as wearing extremely revealing clothing, selling customers expensive drinks, and permitting customers to sexually touch them.  (See, e.g., id. at 300-01, 1126, 1139.) Petitioner himself engaged in this type of sexual touching of the waitresses out in the open.  (Id. at 883-85.)  One of the victims who worked as a bartender and a waitress testified that while the waitresses were made to drink before and during work, the bartenders were "the one[s] who count[ed] the money" and were to stay sober.  (Id. at 300-01, 366.)  The waitresses, however, had to drink, sit on customers' laps and "give them a lap dance."  (Id. at 885.)  The waitresses also performed sexual acts on the customers.  (Id. at 1128.)  The jury also heard testimony about Petitioner himself sexually assaulting the waitresses.  (See, e.g., id. at 887-90.)  For example, one of the waitresses testified that Petitioner sexually assaulted her after taking her inside his house.

5

(Id.)  Another waitress testified that she was sexually assaulted in the bar and was too afraid to call the police because she was "illegal" and because Petitioner threatened that, if she called the police, she would get deported.  (Id. at 1132-45.)

In addition to the victims, two cooperating witnesses also testified at trial.

Jasmin Rivera testified how she helped Petitioner, her brother, open Sonidos and Mariachi and applied for the necessary paperwork in her own name as he was unable to do so himself.  (Id. at 635-777.)  She testified Petitioner ran the bars and described his threats and abuse towards the women working at the bars, which included withholding their pay, threatening to call the police and have them deported if they did not listen to him, and committing sexual assault.  (See, e.g., id. at 510-11, 522-23, 538-39, 552–53, 603–05, 643–45.)  Like Petitioner, Jasmine Rivera would also remind the undocumented women that they did not have papers.  (Id. at 554, 644–45.)  Jasmine Rivera recounted how customers paid to fondle the waitresses, have the sex with them, and engage in other sexual acts.  (Id. at 519–522., 558–75,593, 600, 658, 680, 686–87, 740.)  When the customers paid for sex, they would give the money to Jasmine Rivera, Petitioner, or Whaley.  (Id. at 562.)

Jasmine Rivera testified that a while a few waitresses did not engage in prostitution, most did.  (Id. at 683–86.)  The few waitresses that did not engage in prostitution were in relationships with Petitioner or Whaley.  (Id. at 685–86.)  Jasmine also identified one other such waitress, "Kimberly", who had a boyfriend who was in a gang and would come to the bar to keep an eye on her.  (Id. at 580–82.)  Kimberly did not engage in prostitution or allow her herself to be fondled.[3] (Id.)

---

[3]  "Kimberly"—who identified herself at trial as Elsa—also testified.  (Id. at 392–448.)  Elsa confirmed that she did not let men touch her, but testified about how other waitresses removed their clothing and had sex with customers, including one waitress who Elsa observed telling a man who had exposed his penis that "I don't want to."  (Id. at 402–03, 413–15.)

Manuel Mejia, another cooperating witness, worked at Petitioner's bars as a security guard. Mejia was also an auxiliary police officer with the New York City Police Department ("NYPD"). (Id. at 1316-1409.)  Mejia witnessed Petitioner threatening and mistreating the waitresses and testified about sexual encounters between the waitresses and the bars' customers.  (See, e.g., id. at 1325-26, 1347-48, 135, 1391–94.)

The testimony of the victims and cooperators was corroborated by, among other things, law enforcement witnesses who testified that, in surveilling the bars, they observed many women in extremely revealing clothes going into the cars with the patrons, driving away and then returning back after some time.  (Id. at 47-74.)

Petitioner, Whaley, and Villaman did not testify at trial.  Petitioner did not call any defense witnesses.

Villaman, who had worked at Sonidos, called four defense witnesses, including his fiancée and two friends.  Villaman's fiancée and friends testified that, when they were at Sonidos, they did not observe any prostitution occurring.  (Id. at 1742–1866.)  Villaman was driven to his job at Sonidos by either his fiancée or his friend Paul Newton.  (Id. at 1744, 1836.)  Newton testified that he went to Sondios at least 60 times between 2005 and 2007 and that he would generally stay at Sonidos for six hours each time.  (Id. at 1744, 1764, 1783.)  Newton testified that he did not observe waitresses having "sex of any type" or women taking off their clothes.  (Id. at 1744–45, 1750, 1783.)  Newton, however, did observe customers buying $20 drinks for the waitresses and dancing with the waitresses, and heard the waitresses giving customers their phone numbers.  (Tr. 1746.)  Unlike Newton, Villaman's fiancée, Margaret Patterson, would not stay at Sonidos all night after she dropped Villaman off.  (Id. at 1814–15; see 1818–19 ("Sometimes I would stay a half an hour. Sometimes I would be there for an hour or two.  And sometimes I would go back later and bring

him food.")  Patterson testified that, when she was in Sonidos, she never saw the waitresses being touched in a sexual manner.  (Tr. 1849.)

In his summation, Rivera's counsel argued to the jury that the waitresses worked at the bars willingly, that the sexual activities that occurred were voluntary and consensual, and that the women's testimony otherwise was not credible and was motived by immigration benefits they sought to receive from the Government by claiming that they were victims of the charged crimes. (See, e.g., id. at 1981:9-1991:4 (Obedin's Summation).)

Rivera was ultimately convicted of:

- two counts of sex trafficking conspiracy (Counts 1 and 14) in violation of 18 U.S.C. §§ 371 and 1594 (c) respectively;

- six counts of sex trafficking (Counts 2 through 5, Counts 15 and 16) in violation of 18 U.S.C. § 1591;

- two counts of forced labor conspiracy (Counts 6 and 17) in violation of 18 U.S.C. §§ 371 and 1594 (b) respectively;

- eleven counts of forced labor (Counts 7 through 13, Counts 18 through 21) in violation of 18 U.S.C. § 1589;

- one count of conspiracy to transport and harbor aliens (Count 22) in violation of 18 U.S.C. § 1324; and

- seven counts of transporting (Counts 23 through 29) and seven counts of harboring aliens (Counts 30 through 36) in violation of 18 U.S.C. § 1324.

(ECF No. 233).[4]

After his conviction, Rivera made several post-trial motions, including a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.  Petitioner, through counsel, sought a new

---

[4] The counts of the conviction do not match the counts in the Superseding Indictment because shortly before the trial, the Government dropped the charges on counts 17, 21 and 24 of the superseding indictment, changing the numbering of the counts in the Superseding Indictment and lowering the total number of charged counts from 39 to 36.  (ECF No. 223.)

8

trial, alleging, <u>inter alia</u>, that the verdict was not supported by substantial evidence, there was a typographic error in a jury charge which might have confused the jury, and that the witnesses at trial were not credible, unreliable, and motivations to lie which the Government never disclosed at trial.  (ECF No. 241.)  Judge Feuerstein denied Rivera's motion for a new trial but dismissed two counts of the conviction—sex trafficking and forced labor conspiracies in violation of 18 U.S.C. § 371—as multiplicitous, finding that "the evidence adduced at trial supports only single conspiracies to commit various substantive offenses."  (ECF No. 299 at 19.)[5]

Prior to sentencing, Petitioner, appearing <u>pro se</u>, sought a writ of habeas corpus pursuant to 28 U.S.C. § 2255 (the "First Petition").  After Judge Feuerstein denied the First Petition as premature, Petitioner appealed, and the Second Circuit remanded the case back to Judge Feuerstein for further consideration of the ineffective assistance claims raised in the First Petition.  (ECF No. 340).  Judge Feuerstein subsequently construed the First Petition as a Rule 33 motion and ultimately rejected these claims.  <u>See</u> <u>infra</u> Part II, Section C, Point 2.

The case proceeded to sentencing, where Petitioner was represented by John Carman, Esq. (ECF No. 421.)  Overruling various objections made by counsel, Judge Feuerstein sentenced Petitioner to six concurrent terms of 60 years on two counts of substantive sex trafficking, two counts of substantive forced labor, and on the sex trafficking and forced labor conspiracy counts, to be served concurrently with the lesser terms of imprisonment she imposed on the other counts. (ECF Nos. 391, 393, 421.)

**B.**     **<u>First Appeal</u>**

Petitioner, represented by Carman, appealed the judgment to the Second Circuit.  (ECF No.

---

[5]     Prior to sentencing, Judge Feuerstein, on the motion from the Government, (ECF No. 302), also dismissed as multiplicitous counts 3 and 4 (substantive sex trafficking for 2005 through December 22, 2008) and 8, 9, 11 and 12 (substantive forced labor for 2005 through December 22, 2008), (ECF No. 308).

397.)  Petitioner argued, among other things, that (1) the court erred when it provided a "purely subjective" jury instruction on the sex trafficking counts; (2) Rivera was prejudiced by the instructional error in the forced labor counts; (3) there was insufficient evidence to support Rivera's conviction on some of the sex trafficking, forced labor, and alien harboring counts; and (4) the sentence was procedurally and substantively unreasonable.[6]  (United States v. Rivera, No. 13-2722 (2d Cir.), ECF No. 109.)  Regarding the jury instructions that Judge Feuerstein provided on the sex trafficking charges, the Second Circuit held that the instructions were erroneous as the jury should have been given a "hybrid" definition of the term "serious harm," which "permit[ted] the jury to consider the particular vulnerabilities of a person in the victim's position but also require[d] that her acquiescence be objectively reasonable under the circumstances." United States v. Rivera, 799 F.3d 180, 186-87 (2d Cir. 2015), cert. denied, 578 U.S. 1015 (2016).  However, in light of the evidence presented at trial, the Second Circuit held that this error was "harmless beyond a reasonable doubt." See id.  While the Second Circuit affirmed Petitioner's convictions, it vacated Petitioner's sentence finding that it suffered from procedural deficiencies.  See id. at 187. Petitioner then unsuccessfully sought an en banc rehearing by the Second Circuit.  (ECF No. 303.) The Supreme Court ultimately denied writ of certiorari.  See Villaman v. United States, 578 U.S. 1015 (2016).

**C.**     **Resentencing and Second Appeal**

On April 3, 2017, on remand, Judge Feuerstein resentenced Petitioner to five concurrent terms of 40 years of imprisonment on the sex trafficking counts (substantive and conspiracy), to be served concurrently with the lesser terms she imposed on other counts.  (United States v. Rivera, No. 9-cr-619 (E.D.N.Y.), ECF Nos. 510, 513.)  Petitioner appealed from the amended judgment,

---

[6]      Rivera also joined in the arguments raised by his co-defendants Villaman and Whaley on appeal.  (United States v. Rivera, No. 13-2722 (2d Cir.), ECF No. 109 at 59.)

the Second Circuit affirmed the newly imposed sentence, and the Supreme Court declined to review.  See United States v. Rivera, 758 F. App'x 148 (2d Cir. 2018) (summary order), cert. denied, 139 S.Ct. 1612 (2019).

**D.**   **Procedural History**

Rivera filed the instant petition on October 9, 2019, seeking to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255.  (Pet., ECF No. 533.)  In support, he alleges that he received ineffective assistance of counsel because (1) his trial counsel failed to object, under the Confrontation Clause, to the introduction into evidence of a May 27, 2010 letter written by Whaley; (2) his trial counsel failed to call exculpatory witnesses; (3) his trial counsel failed to move to dismiss the TVPRA conspiracy counts on the grounds that the convictions on these counts violated the Ex Post Facto Clause and were not supported by sufficient evidence; (4) his appellate counsel failed to brief the Second Circuit on the Supreme Court's decision in Elonis v. United States, 757 U.S. 723 (2015); and (5) his trial and appellate counsel failed to move to dismiss on the basis of the alleged constructive amendments of the Superseding Indictment.  (Id. at 13-51.)

On November 21, 2019, the Government moved to dismiss the Petition in its entirety, arguing that it was time-barred as a matter of law.  (ECF No. 538.)  On July 12, 2023, the Court found that Rivera's petition was timely under the applicable precedent set forth in Gonzalez v. United States, 792 F.3d 232 (2d Cir. 2015), and directed the Government to respond to the merits. (July 12, 2023 Order.)  On January 8, 2024, the Government filed its response, denying the claims that Petitioner received ineffective assistance of counsel.  (Resp., ECF No. 615.)  On April 24, 2024, Petitioner filed a reply.  (Reply, ECF No. 623.)

On June 11, 2024, this Court requested that Obedin submit a written response to the allegations in Rivera's Petition concerning alleged exculpatory witnesses, (June 11, 2024 Order),

which he timely provided to the Court, (ECF No. 626.)

## II.   DISCUSSION

### A.   <u>Legal Standard for Section 2255 Petitions</u>

Section 2255 permits a prisoner in federal custody to move to vacate, set aside, or correct the sentence on the grounds that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  "A petition for relief under Section 2255 shall only be granted for a constitutional error when the sentencing court lacked jurisdiction or when a miscarriage of justice arises due to an error of law or fact which created a fundamental defect."  <u>Lopez v. United States</u>, 792 Fed. App'x 32, 35 (2d Cir. 2019) (summary order) (citations omitted).  Relief under Section 2255 is reserved "for prejudicial errors that are so grave, they result in a complete miscarriage of justice."  <u>Kassir v. United States</u>, 3 F.4th 556, 564 (2d Cir. 2021) (internal quotation marks, brackets and citations omitted).  "[Section] 2255 review is 'narrowly limited in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources.'"  <u>United States v. Hoskins</u>, 905 F.3d 97, 102 (2d Cir. 2018) (quoting <u>Graziano v. United States</u>, 83 F.3d 587, 590 (2d Cir. 1996)).

Because Rivera appears <u>pro se</u>, the Court construes his submissions liberally and interprets them as raising the strongest arguments that they may suggest.  <u>See</u> <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam).

**B.**     **Procedural Bars**

"Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks and citation omitted).  First, "[i]t is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal." United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) (internal quotation marks and citations omitted).  "The mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." Yick Man Mui, 614 F.3d at 53 (citation omitted); see also Burrell v. United States, 467 F.3d 160, 165 (2d Cir. 2006) ("rule holds that where issues have been explicitly or implicitly decided on appeal, the district court is obliged, on remand, to follow the decision of the appellate court.").

Second, generally, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." Massaro v. United States, 538 U.S. 500, 504 (2003); see also Yick Man Mui, 614 F.3d at 54.  However, the claims of ineffective assistance of counsel "may appropriately be raised for the first time in a Section 2255 motion, 'whether or not the petitioner could have raised the claim on direct appeal.'" Harrington v. United States, 689 F.3d 124, 129 (2d Cir. 2012) (quoting Massaro v. United States, 538 U.S. 500, 504-509 (2003)).

**C.**     **Ineffective Assistance of Counsel**

In the instant Petition, Rivera alleges multiple instances of ineffective assistance of counsel ranging from the time of indictment to his appeal.  For the reasons stated below, these claims are without merit.

To prevail on an ineffective assistance of counsel claim, a petitioner must satisfy both prongs of the Strickland test, demonstrating that (1) "counsel's representation fell below an objective standard of reasonableness . . . under prevailing norms" and (2) Petitioner suffered prejudice as a result of the counsel's deficient performance.  Strickland v. Washington, 466 U.S. 668, 692 (1984).  The "Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel flounder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

The first prong calls on a petitioner to demonstrate that counsel acted outside of the wide range of reasonable professional assistance and made errors so serious that they failed to function as counsel guaranteed by the Sixth Amendment.  See Strickland, 466 U.S. at 687-89.  In analyzing this prong, a court must be objective and "eliminate the distorting effects of the hindsight" and "evaluate the conduct from counsel's perspective at the time."  Id. at 689.  Furthermore, the court is to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id.

Some of Rivera's claims allege that his appellate counsel was ineffective.  Strickland applies to those claims as well.  See Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992).  However, "[a]ppellate counsel does not have a duty to raise all colorable claims on appeal; rather, counsel should use reasonable discretion to determine which claims constitute a defendant's best arguments for obtaining a reversal of a conviction."  Waiters v. United States, 472 F. Supp.3d 7, 15 (E.D.N.Y. 2020) (internal quotation marks and citations omitted).

The second prong of the Strickland test requires a petitioner to show that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have

been different." Id. at 694.  Crucially, the petitioner must show that "[t]he likelihood of a different result [was] substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011).

If the petitioner makes an insufficient showing on one of the prongs, there is no need for the court to address the other.  See Strickland, 466 U.S. at 697.

Petitioner advances four claims of ineffective assistance concerning his trial counsel, Glenn Obedin, and two claims concerning his appellate counsel, John Carman.  For the reasons stated below, all these claims fail on the merits.

### 1.   Trial Counsel's Failure to Object to Whaley's May 27, 2010 Letter on Confrontation Clause Grounds

#### a.   Background

After his arrest, Petitioner's co-defendant Whaley sent a number of letters to the U.S. Attorney's Office.  (See ECF Nos. 191, 193.)  Two of these letters are relevant to Rivera's claim that Obedin was ineffective for failing to raise a Confrontation Clause objection at trial.

Whaley's letter dated May 27, 2010 ("May 27 Letter") states:

> Dear Mr. Jones, Did you know that I know two commercial businesses in Suffolk County that forces girls to work and provide sex acts for money by beatings and holds girls against their wills?  Did you know that the owner forces the girls to have sex with people and himself and smacks the girls to make him the money?  Did you know that I know where some girls live that will make statements on that person(s)? Did you know that I've see this with my own eyes? Trial is set for October 12th, 2010, cant wait. Yours etc., JW.

(GX125; see Trial Tr. 1733:10-25.)  As explained below, the Government would ultimately introduce this letter at trial and argue that the two bars referenced in this letter were Sonidos and Mariachi—the bars run by Petitioner.

In another letter, dated June 17, 2010 ("June 17 Letter"), Whaley wrote, in relevant part:

> If you want to see prostitution and harboring aliens you should stop by, Obsession bar in Hempstead or Latino Mix in Patchogue or La Perla Latina in Selden or Luna

> <u>Sports</u> Bar in Central Islip or <u>Cristal Bar</u> in Riverhead or <u>Tequilla</u> in Bellport or
> <u>Casa Norte</u>, in Coram.

(GX126 (emphasis in original); <u>see</u> Trial Tr. 1732:11-15.)  The Government did not allege that Petitioner had any involvement with these bars.

Prior to trial, the Government sought permission to introduce the portion of the June 17 Letter quoted above and to exclude purportedly exculpatory statements made by Whaley in this and other letters.  (ECF No. 160.)  Judge Feuerstein allowed the Government to introduce the portion of the June 17 Letter set out above and rejected Whaley's argument that additional statements in this and other letters should also be allowed into evidence under the rule of completeness embodied in the Federal Rule of Evidence 106.  (Trial Tr. at 1040-42, 1064:25-1065:13.)

Whaley subsequently filed a motion <u>in limine</u> in an effort to prevent the Government from introducing the May 27 Letter at trial.  (ECF No. 191.)  Whaley argued that the May 27 Letter should be not admitted into evidence unless Whaley was permitted, under Rule 106, to introduce the other letters he sent, which contained exculpatory statements and were purportedly necessary for the jury to understand the May 27 Letter.  Judge Feuerstein denied Whaley's motion.  (ECF No. 232.)

At trial, the Government introduced the May 27 Letter in its entirety and the portion of the June 17 Letter quoted above.  These two documents were introduced through William Brust, a Department of Homeland Security ("DHS") agent and the Government's last witness, who also read them to the jury.  (Trial Tr. 1730:1-1733:25.)  Later, at the close of rebuttal summation, the

Government cited the May 27 Letter and argued to the jury that the two "commercial businesses" mentioned in it were Sonidos and Mariachi.[7] (Id. at 2052:14-2053:3.)

At the conclusion of the Government's rebuttal summation, Whaley's counsel moved for a mistrial. Whaley argued that, because the other letters Whaley sent were not in evidence to provide necessary context, the Government was able to inaccurately characterize the May 27 Letter as a confession. (Id. at 2054–56.) Obedin and Villaman's counsel joined in Whaley's motion without raising any additional specific grounds for the requested mistrial. (Id. at 2054–55.) The Government responded that its argument was proper because an "inference" could "be drawn from this letter that it was a confession." (Id. at 2055.) Judge Feuerstein refused to grant a mistrial and stressed that she had instructed the jury several times that summations are not evidence. (Id. at 2056–57.)

> b.   Analysis

Rivera argues that, because Whaley did not testify, the admission of the May 27 Letter violated his constitutional right to confront witnesses and prejudiced him. (Pet. at 13-17.) He points to the Government's use of the letter during summation and the connection that the Government drew between the two bars in the letter and Rivera. (Reply at. 1-3.) Rivera claims that Obedin was ineffective because he failed to object to the admission of the May 27 Letter on

---

[7]   Specifically, in rebuttal summation, the Government read the May 27 Letter to the jury and argued:

> Ladies and gentlemen, consider what two bars the defendant Whaley is talking about. You heard about two bars in Suffolk County through the course of this trial, Mariachi and Sonidos. You know that Whaley worked driving the van for Antonio Rivera, transporting the waitresses back and forth to these bars. Which two bars do you think Whaley is talking about in this letter? I believe it is clear which two bars he is talking about where the owner forces the girls to have sex against their will and smacks the girls to make money for him. I submit to you the two bars that Whaley is talking about in the letter are Sonidos and Mariachi.

(Trial Tr. 2052:14-2053:3.)

hearsay and Confrontation Clause grounds and also failed to raise this issue in any post-trial motions.  (Pet. at 13-17.)

The Confrontation Clause of the Sixth Amendment "guarantees a criminal defendant the right to cross-examine government witnesses at trial."  United States v. Figueroa, 548 F.3d 222, 227 (2d Cir. 2008).  "[I]n joint trials, the admission of a non-testifying defendant's confession incriminating a co-defendant without the opportunity for cross-examination is prejudicial error in violation of the Sixth Amendment's Confrontation Clause."  United States v. Hunter, No. 18-3074-CR, 2022 WL 1166623, at *5 (2d Cir. Apr. 20, 2022), aff'd sub nom. Samia v. United States, 599 U.S. 635 (2023) (citing Bruton v. United States, 391 U.S. 123 (1968)).  Under Bruton, such a confession cannot be admitted even if the trial court provides a limiting instruction informing the jury that it can only consider the confession against the confessor and not against any co-defendants. See Cruz v. New York, 481 U.S. 186, 190-94 (1987) (holding that "the Confrontation Clause bars [the co-defendant's confession] admission at the[] joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him").  The Supreme Court, however, recently made clear that Bruton and its progeny distinguish "between confessions that directly implicate a defendant and those that do so indirectly."  Samia v. United States, 599 U.S. 635, 648 (2023).  In Samia, the Supreme Court explained that in Richardson v. Marsh, 481 U.S. 200 (1987), it "declined to expand the Bruton rule to a redacted confession that inculpated the defendant only when viewed in conjunction with other evidence." Samia, 599 U.S. at 649.  Samia confirms that when a co-defendant's confession only indirectly implicates the defendant and the jury is given a limiting instruction, the confession is admissible.  See id.

18

The Supreme Court's approach to analyzing this issue in <u>Samia</u>—which, notably, affirmed the Second Circuit's rejection of a <u>Bruton</u> claim—is in accord with the standard applied by the Second Circuit <u>pre</u>-Samia.  Even prior to <u>Samia</u>, the Second Circuit had taken the position that "[w]here a jury must look to other trial evidence to link a defendant to a redacted confession, the Confrontation Clause 'calculus changes' sufficiently to remove the statement from <u>Bruton</u>'s protective rule."  <u>United States v. Jass</u>, 569 F.3d 47, 64 (2d Cir. 2009) (quoting <u>Richardson</u>, 481 U.S. at 211).  Thus, a "'defendant's <u>Bruton</u> rights [would be] violated . . . only if the statement, standing alone, would clearly inculpate him without [the] introduction of further independent evidence.'"  <u>United States v. Delgado</u>, 971 F. 3d 144, 155 (2d Cir. 2020) (quoting <u>United States v. Wilkinson</u>, 754 F.2d 1427, 1435 (2d Cir. 1985)); <u>see also</u> <u>United States v. Lyle</u>, 919 F.3d 716, 733 (2d Cir. 2019) (noting that the courts are to evaluate such statements "separate and apart from any other evidence admitted at trial").

Here, at trial, Obedin did not object to the admission of the May 27 Letter on hearsay or Confrontation Clause grounds.  He also did not request a limiting instruction and no such instruction was given by Judge Feuerstein.  However, even assuming <u>arguendo</u> that Obedin's failure to object to the letter's admission or request a limiting instruction could be construed as deficient performance, Petitioner cannot satisfy the prejudice prong of the <u>Strickland</u> test.

As an initial matter, there is not a reasonable probability that an objection to the May 27 Letter on Confrontation Clause grounds would have resulted in the exclusion of the letter.  The May 27 Letter does not, on its face, directly implicate Rivera or even mention Sonidos and Mariachi by name.  Accordingly, under applicable Second Circuit precedent at the time of trial (as well as under the Supreme Court's recent decision in <u>Samia</u>), Whaley's May 27 Letter was admissible.  The Court, however, assumes that, in conjunction with the admission of the May 27

Letter into evidence, Rivera was entitled to a limiting instruction informing the jury that the letter could only be considered against Whaley and could not be considered against Rivera. Even assuming that Obedin should have objected to the naked admission of the May 27 Letter and demanded such a limiting instruction,[8] Rivera cannot establish that there is a reasonable probability that the jury would have reached a different result if they had been given this limiting instruction.[9] Accordingly, Rivera cannot establish prejudice.

Here, the evidence against Rivera at trial was overwhelming and "[t]he record establishes that it was not reasonably likely that the instruction would have made any difference in light of all the other evidence of guilt." Berghuis v. Thompkins, 560 U.S. 370, 390-91 (2010) (finding that in light of the "ample evidence" against the defendant at trial, petitioner, who claimed that counsel was ineffective for failing to request a limiting instruction, could not show prejudice). Whaley's May 27 Letter was only one piece of evidence that potentially connected Rivera to the bars and the charged crimes. At trial, multiple victims and other eyewitnesses testified that Rivera was the bars' owner. His sister and co-conspirator Jasmin Rivera testified that Petitioner was the owner of Sonidos and Mariachi and described in detail the scheme that she and Petitioner had put in place. (Trial Tr. at 452:10-469:17.) The evidence at trial was extensive and multiple victims and other witnesses pointed not only to Petitioner's ownership of the bars but to his direct involvement in the crimes in which he was charged. The victims described how Rivera mistreated, threatened,

---

[8]    Given that Obedin could not have prevented the admission of the May 27 Letter, his decision not to request a limiting instruction may well have been strategic. A limiting instruction would have highlighted the May 27 Letter and may have ultimately caused the jury to focus greater attention on the letter.

[9]    The Court assumes arguendo that—if Obedin had raised a Confrontation Clause objection and demanded a limiting instruction—the Government's rebuttal summation concerning the May 27 Letter would have been somewhat more circumspect. However, even if the jury had received a limiting instruction and the Government had never mentioned the May 27 Letter in its summation, there is still not a reasonable probability that the result of trial would have been different.

and effectively sold them to customers for sex.  These witnesses implicated Rivera directly while Whaley's May 27 Letter did not even mention him by name.  While the Government referenced the May 27 Letter in its summation, the letter was not central to its case.  Rather, the Government's case was built on the testimony of the victims and the cooperators Jasmin Rivera and Manuel Mejia, who had direct knowledge of Petitioner's criminal conduct.

The Court also notes that the manner in which the Government introduced the May 27 Letter at trial likely minimized any implied connection between Rivera and the May 27 Letter. The May 27 Letter was introduced immediately after the June 27 Letter, which did not mention Sonidos or Mariachi and instead explicitly named other establishments which were not the subject of the trial and were not alleged to have been affiliated with Rivera.

Given all the circumstances here, there is not a reasonable probability that a limiting instruction concerning the May 27 Letter would have led to a different result at trial.[10]

Rivera's related argument that Obedin was ineffective for not raising a Confrontation Clause claim in a post-trial motion fails for similar reasons.  Given that no objection was lodged at trial on Confrontation Clause grounds, any post-trial motion raising this issue would have resulted in the Confrontation Clause claim being reviewed under the plain error standard.  See Fed. R. Crim. P. 52(b).  Given the overwhelming evidence arrayed against Rivera, there is not a reasonable probability that Judge Feuerstein or the Second Circuit would have found that the absence of a limiting instruction here rose to the level of plain error warranting a new trial.  See United States v. Birkett, 419 F. Supp. 2d 536, 543 (S.D.N.Y. 2006) ("Given the overwhelming evidence adduced at trial against Defendants, this Court carries 'fair assurance' that the Crawford

---

[10]    Even assuming for the sake of argument that an objection on Confrontation Clause grounds would have resulted in the complete exclusion of the May 27 Letter, there is not a reasonable probability of a different result given the other overwhelming evidence introduced against Rivera at trial.

error did not 'substantially influence the jury' or contribute to the guilty verdict obtained against the Defendants"); <u>see also</u> <u>United States v. Sotto</u>, 380 F. App'x 852, 859 (11th Cir. 2010) ("Assuming for the sake of argument that the admission of [witness's] testimony was legal error, the overwhelming evidence of [defendant's] involvement in the PNH fraud ensured that [the defendant's] substantial rights were not affected"); <u>United States v. Dukagjini,</u> 326 F.3d 45, 60-61 (2d Cir. 2003) (discussing that a defendant's failure to raise a Confrontation Clause objection, even where the subject testimony was challenged on other grounds, is reviewed for a plain error). Accordingly, Petitioner's ineffective assistance claims concerning the May 27 Letter fail.

### 2.      Failure to Call Exculpatory Witnesses

Petitioner next claims that Obedin was ineffective for failing to investigate and ultimately call at trial witnesses who worked at the bars and who would have provided allegedly exculpatory testimony. (Pet. at 22-29.)  The Government argues that Petitioner is precluded from bringing this claim in the present Section 2255 petition because he previously raised it before Judge Feuerstein and failed to appeal her denial of this claim. (Resp. at 8-9.)  The Government also contends that the claim is substantively meritless. As explained below, the Court concludes that this ineffective assistance claim fails on the merits.

### a.      <u>Background</u>

The instant petition is not the first time Rivera has alleged that Obedin was ineffective with respect to possible defense witnesses. (Pet. at 22.)  Before the trial, Petitioner had asked Judge Feuerstein to relieve Obedin as his defense counsel because of, among other things, Obedin's alleged failure to interview witnesses. (ECF No. 79.)  However, Petitioner later withdrew this request and indicated that he was "satisfied with representation." (ECF No. 80.)  Obedin then represented Rivera at trial which resulted in a guilty verdict. After the trial, but before the

sentencing, Petitioner again moved to relieve Obedin from representing him.  (ECF No. 238.)
Judge Feuerstein denied the motion, (June 30, 2011 Order), but, after being informed that Rivera
had filed a grievance against Obedin, she relieved Obedin and appointed Carman to represent
Rivera.  (ECF Nos. 254, 256.)

In November 2011, while awaiting sentencing, Rivera filed his first pro se § 2255 petition
(the "First Petition") alleging that Obedin provided ineffective assistance at trial.  Rivera argued,
among other things, that Obedin was ineffective for not calling three witnesses at trial—Michele
Marino, Blanca Nunez, and Ana Ventura.  (First Pet., Rivera v. United States, No. 11-cv-5579
(E.D.N.Y.), ECF No. 1 at 7.)  Rivera also claimed that Obedin was ineffective for "fail[ing] to
interview . . . defense witnesses."  (Id.)  In February 2012, Judge Feuerstein dismissed the First
Petition as premature.  (ECF No. 4.)  Rivera then sought a certificate of appealability from the
Second Circuit.  (Rivera v. United States, No. 12-2254 (2d Cir.), ECF No. 25.)  In November 2012,
the Second Circuit denied the certificate of appealability, but remanded the claims of ineffective
assistance back to Judge Feuerstein, noting that she "may consider, in the first instance, whether it
is appropriate to inquire into the merits of the claim prior to judgment."  (ECF No. 35.)

Judge Feuerstein subsequently construed Rivera's First Petition as a Rule 33 motion and
directed Obedin to respond to Rivera's ineffective assistance claims.  (May 10, 2013 Order.)

According to the First Petition, Marino, Nunez, and Ventura visited Obedin in October
2009 at his office.  (First Pet. at 7.)  While the First Petition asserted that these three witnesses
could provide "information regarding the bars," it did not provide any further details about what
specific testimony they could provide.  (Id.)  Rivera's First Petition did not include any sworn
statements from these witnesses or Rivera himself in support of this claim.

Obedin's response to the First Petition explained that "none of these witnesses gave

information that proved helpful to Mr. Rivera's case."  (<u>United States v. Rivera</u>, No. 9-cr-619 (E.D.N.Y.), ECF No. 374.)

In November 2012, Whaley, Rivera's co-defendant, also filed a <u>pro se</u> motion for a new trial raising numerous claims, including ineffective assistance of counsel.  (ECF No. 339.)  Whaley asserted that his trial counsel, Tracey Gaffey, Esq., failed to call unspecified defense witnesses who could have testified about their employment at Sonidos and Mariachi.  (<u>Id.</u> at 3.)  Gaffey filed a response to Whaley's motion explaining that she and her investigator "attempted to reach a number of people in connection with this case."  (ECF No. 384.)  According to Gaffey, "[s]ome and were contacted and some were unresponsive," but none were "helpful to Mr. Whaley's case." (<u>Id.</u>)

On June 11, 2013, Judge Feuerstein denied Rivera's Rule 33 Motion, finding that it was untimely and that it also failed on the merits.  (Opinion & Order ("June 2013 Order"), ECF No. 382.)  Judge Feuerstein similarly denied Whaley's motion for a new trial.  Judge Feuerstein explained that both Obedin and Gaffey articulated "clear, sensible, strategic reasons" for their conduct and that the claims advanced by Rivera and Whaley were implausible on their face.  (<u>Id.</u> at 7.)  Judge Feuerstein concluded that "in light of the overwhelming evidence of Rivera's [guilt] . . ., there is not a reasonable probability that," but for the alleged errors of counsel, the result of the proceeding would have been different.  (<u>Id.</u> at 10.)  Judge Feuerstein also stressed Obedin's uncontradicted statement that none of the witnesses with whom he spoke provided information useful to Rivera's case.  (<u>Id.</u> at 11.)

Rivera did not appeal Judge Feuerstein's June 2013 Order.

In the instant § 2255 petition, Rivera again claims that Obedin was ineffective for not interviewing and calling witnesses.  (Pet. at 22-29.)  Rivera reasserts that Obedin should have

called Marino, Nunez, and Ventura.  As with his First Petition, Rivera does not provide sworn or notarized statements from these three individuals.

Rivera's instant petition also raises ineffective assistance claims regarding four other witnesses who worked at his bars—Edna Marte, Helene Colon, Luzmaria Fuentes, and Yolanda Recinos.  Rivera suggests that Obedin's 2009 interviews of Marino, Nunez, and Ventura should have led Obedin to investigate further and to discover, interview, and call at trial these four additional witnesses.  Although Rivera ran the two bars, he does not allege that he ever specifically informed Obedin that Marte, Colon, Fuentes, and Recinos were potentially favorable witnesses.

In support of the ineffective assistance claims in the present Petition, Rivera provides two brief notarized letters from Colon and Fuentes which were drafted in 2016.  Colon and Fuentes attest that they are U.S. citizens who worked at Rivera's two bars and never saw any prostitution occurring there.  (ECF No. 533-2.)  Colon also states that she never witnessed Rivera abusing or taking advantage of any of the employees.  (Id.)  Both Colon and Fuentes suggest that, after the bars were raided, investigators did not speak with the employees who were U.S. citizens and "excluded" them "from the case."  (Id.)  The brief letters submitted by Colon and Fuentes do not identify what jobs they held at Rivera's bars.  The brief letters from Colon and Fuentes also say nothing about how the bars operated, how the waitresses were paid, and how the customers interacted with the waitresses at the bars.

With respect to Marte, Rivera provides a Newsday article in which Marte was quoted, along with Marino, denying that any abuse occurred at the bars and that anyone at the bars was "doing anything bad to us."  (Id.)  Rivera, however, does not provide any sworn statement or

notarized letter from Marte.[11]

In November 2023—more than a decade after trial and four years after filing the instant § 2255 petition—Rivera submitted an "affidavit" from Recinos which she executed on October 17, 2023.  Recinos' affidavit also denies that prostitution occurred at Rivera's bars and provides further details, which are discussed below.[12]  (ECF No. 613.)

In June 2024, the Court directed Obedin to respond to the allegations in Rivera's petition concerning allegedly exculpatory witnesses.  Obedin filed a response on June 12, 2024, in which he explained, inter alia, that Recinos's name was never "made known to me at any time by either Mr. Rivera or anyone on Mr. Rivera's behalf."  (ECF No. 626.)

      b.    Analysis

The Government argues that Rivera's current ineffective assistance claims concerning allegedly exculpatory witnesses fail on both procedural grounds and on the merits.

As a threshold matter, the Government contends that these ineffective assistance claims "must fail as the petitioner previously raised the issue of ineffective assistance of counsel due to failure to call certain witnesses at trial."  (Resp. at 8.)  Judge Feuerstein's June 2013 Order denied Rivera's Rule 33 motion and Rivera failed to appeal that denial.

If Rivera had appealed Judge Feuerstein's June 2013 Order and the Second Circuit had affirmed her denial of this ineffective assistance claim on the merits, Rivera would have been barred by the mandate rule from relitigating the ineffective assistance claim concerning Marino,

---

[11]    The Court notes that Rivera's sentencing submission included a brief letter from Marte.  (ECF No. 364-1.) That letter—which is not sworn or notarized—does not specifically address the allegations of prostitution and abuse explored at trial, and simply states that "Rivera was a loyal, caring, generous, honest, and very respectful person . . . [with a] great heart."  (Id.)

[12]    The Court notes that none of the three notarized witness statements are actually sworn under the penalty of perjury.  However, even assuming that the statements are comparable to sworn affidavits, the Court finds that they do not entitle Rivera to any relief.

26

Nunez, and Ventura. Rivera may have also been barred by the mandate rule from asserting the related ineffective assistance claim in his current Petition concerning Marte, Colon, Fuentes, and Recinos.[13] However, Rivera did not appeal Judge Feuerstein's June 2013 Order denying his Rule 33 Motion. As such, by its terms, the mandate rule does not appear to be applicable (and it is not clear if any other aspects of the law of doctrine case might apply here). Accordingly, the Court will address the merits of Rivera's claims.[14]

On the merits, Rivera fails to show that Obedin's performance was deficient.

It is well established that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." Lacey v. Perez, No. 10–CV–1460, 2013 WL 1339418, at *11 (E.D.N.Y. Mar. 28, 2013) (internal quotation marks and citation omitted). Furthermore, a "counsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." United

---

[13]     Although Rivera's current claim concerning these four witnesses is not identical to the claims he raised in the First Petition/Rule 33 Motion, it is sufficiently similar that the mandate rule may have applied. See Yick Man Mui, 614 F.3d at 52 ("Where a defendant alleges varying factual predicates to support identical legal claims relating to a particular event, all claims constitute a single 'ground' for relief for purposes of applying the mandate rule in collateral proceedings."); see also id. at 56 ("[S]trategies, actions, or inactions of counsel that gave rise to an ineffective assistance claim adjudicated on the merits on direct appeal may not be the basis for another ineffective assistance claim in a Section 2255 proceeding.").

[14]     It is clear, under Massaro v. United States, 538 U.S. 500, 508 (2003), and Yick Man Mui, 614 F.3d 50, that if Rivera had not raised an ineffective assistance claim before Judge Feuerstein prior to sentencing that he would not have been required to raise such a claim, for the first time, as part of his direct appeal to the Second Circuit. Rivera, however, did litigate his ineffective assistance claim in district court prior to his direct appeal. Judge Feuerstein further developed the record by directing Obedin to respond to Rivera's ineffective assistance claim. Given those circumstances, there would seem to be compelling reasons why Rivera should have been required to appeal Judge Feuerstein's June 2013 Order and should now be precluded from relitigating his ineffective assistance claim concerning allegedly exculpatory witnesses. If Rivera had appealed Judge Feuerstein's June 2013 Order, the Second Circuit could have determined whether if it was appropriate to review this claim on the merits or to permit Rivera to instead pursue the claim in a 2255 proceeding. See United States v. Fleurimont, 401 F. App'x 580, 583 (2d Cir. 2010). However, it is unclear if Second Circuit precedent required Rivera to appeal Judge Feuerstein's June 2013 Order in order to avoid the mandate rule (or other aspects of the law of case doctrine) and to preserve all the ineffective assistance claims he is currently pursuing.

States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (internal quotation marks and citations omitted).

"'Courts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury.'" Lopez v. United States, 792 Fed. App'x 32, 38 (2d Cir. 2019) (summary order) (quoting Greiner v. Wells, 417 F. 3d 305, 323 (2d Cir. 2005)).

Relatedly, while defense attorneys have a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," courts "evaluate the reasonableness of an attorney's investigative choices with a 'heavy measure of deference to counsel's judgments.'" Englert v. Lowerre, No. 22-2016-PR, 2024 WL 3818574, at *9 (2d Cir. Aug. 15, 2024) (quoting Strickland, 466 U.S. at 691, and Cullen v. Pinholster, 563 U.S. 170, 195 (2011)).

With respect to Marino, Nunez, and Ventura, Rivera has not offered any notarized or sworn statements from these individuals indicating:  (1) what they would have testified to if called as witnesses; or (2) what they told Obedin when he spoke with them in 2009.[15]  By contrast, the record contains Obedin's statement that Marino, Nunez, and Ventura did not provide "information that proved helpful to Mr. Rivera's case." (United States v. Rivera, No. 9-cr-619, ECF No. 374.) In his response to the Court's June 11, 2024 Order, Obedin reiterated that the "information [from these three witnesses] was neither exculpatory nor helpful to Mr. Rivera's case."[16] (ECF No. 62.)

---

[15]    The Court notes that docket No. 09-cr-619 includes a letter from Marino addressed to Judge Feuerstein which is dated September 7, 2011 and was filed on the docket in April 2012.  In the letter, which is unsworn and not notarized, Marino asked for leniency for Rivera's sentencing. (ECF No. 268.)  Carman also included a copy of Marino's letter with his May 17, 2013 sentencing submission for Rivera. (ECF No. 364-1.)  Marino's letter states that she worked as a bartender at Mariachi and never witnessed Rivera encourage others to drink or perform sex acts. (Id.)  She also states that she did not witness Rivera mistreating or disrespecting others. (Id.)  Marino's letter states that she was interviewed by the detectives and told them she wanted to testify and that she "also raised my consent to [Obedin]," but was never contacted to testify. (Id.)  Rivera has never provided a sworn or notarized letter from Marino, who committed suicide in 2018. (Reply at 3.)

[16]    Obedin's two responses are buttressed by Gaffey's submission to Judge Feuerstein in which she similarly explained that none of the witnesses that she and her investigator contacted were "helpful to Mr. Whaley's case."

The Court concludes that Obedin acted reasonably in not calling these three witnesses.

Moreover, a November 2013 filing by Whaley further undermines Rivera's ineffective assistance arguments.  In November 2013, Whaley filed a § 2255 Petition in which he claimed that his own trial counsel was ineffective for, inter alia, failing to call certain allegedly exculpatory witnesses, including Ventura and Nunez.  (ECF No. 410 at 19–20.)  Attached to Whaley's petition were notes from government interviews of employees, including Ventura and Nunez.  These interview notes indicate that putting Ventura, Nunez, or any other employees on the stand would have been much more likely to harm, rather than help, Rivera.[17]

As for Colon, Fuentes, and Recinos—three witnesses who are mentioned for the first time in the instant petition—there is no evidence that Rivera, who ran the subject bars, ever informed

---

[17]      Nunez told investigators on August 11, 2009 that she used to live with Rivera and had been dating him for a year.  (Id. at 159.)  On August 14, 2009, she reported that when Rivera would get angry with the girls, he would call them "slut, whores, and bitches."  (Id. at 163.)  She also stated that: (1) when girls became intoxicated the men would bring them to the bathroom to take advantage of them; (2) the girls were frightened of Rivera because he was "always throwing things, screaming, and berating the females"; and (3) Rivera would tell the girls "if you drink you will feel more comfortable and lose your shame."  (Id.)  When Nunez and Rivera had relationship "problems" he told her that she could not leave his house, and he took her phone and her bag that contained her "papers."  (Id.)  After that incident, Nunez made sure never to disobey Rivera again.  (Id.)

Ventura (who was also known as Ana Cruz) told investigators on August 11, 2009 that Rivera would yell at her if "she didn't let the men touch her."  (ECF No. 410 at 152.)  In another interview session held in September 2010, Ventura stated that if she did not drink with clients Rivera would "get angry and grab [her] by the arms and tell her you're a whore, like all the others."  (Id. at 153.)  According to Ventura, Rivera told her that if she went to work at another place, "I'll bring you back by your hair."  (Id.)  Ventura also reported that on one occasion Rivera "grabbed [her] forcefully, and began touching and kissing her," did not stop when she told him to, and only stopped when she got mad.  (Id.)  Ventura was also interviewed on March 25, 2011.  (Id. at 155.)  The notes from this final interview session do not include similar statements.  At the March 25, 2011 interview, Ventura stated that she received her nightly $40 wage and tips and denied that there were other ways to make money at Mariachi.  (Id. at 155–57.)  At this interview session, Ventura stated that three American waitresses would climb up on the bar and remove their clothes, but that she did not see any other waitresses do this.  (Id. at 157.)  She also told investigators that she did not see any waitresses lift up their skirts.  (Id.)

Some of the interview notes also suggest that efforts were made to tamper with witnesses.  For example, one employee, Ana Peralta, reported to investigators in May 2010 that an individual approached her and told her that she could receive a "compensation/reward" if she helped Rivera.  (Id. at 140.)  At an earlier September 2009 interview, Peralta had informed investigators that Rivera told her to "sell more drinks, [and] let the men touch you or he would report [her] because she had no papers."  (Id. at 137.)  The prospect of potential witness tampering created additional risks in calling any employees as defense witnesses.

Obedin that Colon, Fuentes, and Recinos were potentially favorable witnesses.[18]  In his June 2024 response, Obedin explains that he did not know Recinos, had "never met or spoken with her, nor was her name made known to [him] at any time by either Mr. Rivera or anyone on Mr. Rivera's behalf."[19]  (ECF No. 626.)  Rivera suggests that Obedin's investigation and interviews of Marino, Nunez, and Ventura should have led him to discover these three additional witnesses.  However, as explained above, Rivera has not provided any affidavits from Marino, Nunez, and Ventura attesting to the substance of their conversations with Obedin in 2009.  Moreover, as explained earlier, the interview notes of Ventura and Nunez affirmatively indicate that, after speaking with Ventura and Nunez, Obedin had ample reasons to conclude that calling employees of the bars as witnesses would not be helpful to Rivera's defense.

Moreover, even assuming for the sake of argument that Obedin should have discovered and interviewed Colon, Fuentes, and Recinos, Rivera cannot establish that Obedin's failure to call them at trial constitutes ineffective assistance or prejudiced him.

Given the evidence introduced by the Government, Obedin pursued a reasonable trial strategy by arguing that the alleged victims voluntarily engaged in prostitution at the bars, were not coerced or tricked into working there, and that their testimony otherwise was not credible because they hoped to obtain immigration benefits by testifying against Rivera and his co-defendants.  Rivera's newly identified witnesses baldly assert that, actually, no prostitution occurred at Rivera's bars.  Given the evidence presented at trial, such testimony would have

---

[18]     While Marte was identified in a Newsday article, Rivera's claim that Obedin should have called Marte fails on other grounds given, among other things, the absence of any sworn affidavit or notarized letter from Marte indicating what testimony she would have provided if called at trial.

[19]     Recinos' affidavit states that in 2011, two people came to her house to ask her about the case and she "told them basically what I'm telling you now but never heard back from them; not sure what side they were working on, the defense or the prosecutor."  Her affidavit does not state that she spoke with Obedin and Obedin explicitly denies ever speaking with Recinos.  Recinos' affidavit is so vague that it is insufficient to even create a factual dispute on the question of she ever spoke to Obedin.

30

appeared incredible, and it was reasonable to pursue a different defense strategy at trial.  Rather than running the risks of calling employee witnesses, Obedin pursued a reasonable strategy of attacking the government witnesses on cross-examination.  Moreover, rather than trying to argue—as Rivera now claims—that "none of the sexual activities" alleged by the Government's witnesses "ever took place," (Petition at 22), Obedin pursued a much more reasonable alternative strategy at trial.  In his closing, Obedin argued that the waitresses were not tricked into working at Rivera's bar and "from day one they were given the job description. Sit with the customers, have them buy you drinks, wear sexy clothes, dance with the customers and touch those men and let them touch you." (Tr. 1983–84.)  Obedin argued that the waitresses were able to observe, from the outset, "what was going on" at Rivera's bars and that they willingly engaged in prostitution as evidenced by, among other things, the testimony of:  (1) one waitress who had "special customers who she would date outside of Sonidos"; and (2) another waitress who returned to work at Sonidos after being in California for three months.  (Tr. 1983–84.)  Given the evidence at trial, it would have been difficult, if not impossible, to convince jurors to credit the testimony of witnesses who claimed that no prostitution and sexual activities were occurring at Rivera's bars.

Furthermore, the record here does not suggest that Colon, Fuentes and Recinos would have been helpful and credible witnesses at trial.  The notarized letters from Colon and Fuentes are conclusory and brief.  While Recinos's affidavit offers some additional details, its substance provides ample reasons why a reasonable defense counsel would decide not to call Recinos as a matter of strategy.[20]  According to Recinos, she "never saw anything fishy or out of place" and "no sort of prostitution went on" while she worked for Petitioner.  (ECF No. 613.)  Recinos,

---

[20]     The Court also notes that Rivera submitted the affidavit of Recinos in 2023, more than a decade after the trial and seven years after he obtained notarized statements from Colon and Fuentes.  Rivera does not explain why his earlier submissions did not even mention Recinos or why her affidavit was not obtained until 2023.  These omissions and this lengthy gap of time is a further reason to question the credibility of Recinos's affidavit.

however, also admits that three "very sexy" "Dominican girls who lived in the Bronx" would be picked up in a van and driven to the bars and that "the customers liked them a lot." (Id.) She also states: "I used to say to myself [about the male customers that] I thought they were dumb because they would spend a lot of money on the girls without any benefit from it so in my head, I was like, I think they'd be better off going to a strip bar or something, at least they'd be able to get more for their money." (Id.) Defense counsel would have ample reason to believe that such testimony would appear incredible to the jury and would not fare well under cross-examination by the Government. It would be reasonable to conclude that putting Recinos on the stand was very risky and that Rivera would be better served by Obedin's alternative strategy of attacking the Government's witnesses on cross-examination and arguing to the jury that the alleged victims willingly engaged in prostitution and sexual activities without any fraud or coercion.

The Court also notes that the proffered testimony of Colon, Fuentes, and Recinos does not directly contradict much of the specific testimony of the victims. None of the victims testified that Colon, Fuentes, or Recinos were present for any of the specific incidents that the victims recounted at trial. And the sworn statements submitted by Colon, Fuentes, and Recinos do not mention any of the specific victims who testified at trial. Moreover, numerous incidents addressed at trial did not even occur in the bar area—they occurred in the basement, in the bathroom, in the kitchen, in cars in front of the bar, and, off-site, at the patrons' homes. For example, Nelci testified that the patrons paid Rivera to take her to their homes to have sex with her. (Trial Tr. at 225-226, 230.) Nelci testified about another waitress who also required to go to customers' homes. (Id. at 235.) Keiby testified that Rivera assaulted her in the kitchen of Sonidos. (Id. at 805-06.) Sandra testified that Rivera sexually assaulted her at his house when she was about 15 years old. (Id. at 887-89.) Alma described how customers at Sonidos had sex with her in the basement of the bar and in the

bathroom, and that Rivera identified them as "client[s]" but never paid her the money for these encounters.  (Id. at 1042-44; see also id. at 1054-55.)  Cesia testified how a customer had sex with her in the basement after telling her that he paid Jasmin Rivera for it.  (Id. at 1173-74.)  Another waitress, Leslie, testified that she was so intoxicated when she taken to customers' homes for sex that she did not realize what was happening.  (Id. at 1495-96.)  If Rivera had called Colon, Fuentes, or Recinos, the Government would have surely stressed, among other things, the fact that those defense witnesses would not have been present to observe the victims' alleged sexual encounters with customers and defendants that occurred off-site.

In his petition, Rivera also highlights the fact that Colon and Fuentes were U.S. citizens who, according to their statements, were purportedly treated well at the bars.  However, such testimony would not necessarily have been particularly helpful to the defense.  The Government's theory and evidence at trial was that Rivera was able to coerce undocumented women into prostitution.  The victims testified that they were threatened to never call the police and reminded of their illegal immigration status.  Rivera asserts that all the witnesses who were undocumented had reasons to lie, whereas U.S. citizens—who did not stand to gain any immigration benefits from their testimony—would be more believable in their claims that no prostitution and assaults took place at the bars.[21]  However, there were obvious downsides to relying on the testimony of witnesses who were U.S. citizens.  The Government could easily argue that Rivera did not hold the same leverage over them as over the undocumented employees and, thus, did not subject them to the same treatment.

---

[21]    Recinos asserts in her affidavit that Rivera and the other defendants were not aware of her citizenship status because she only spoke Spanish at the bars, and they never requested her documentation.  The record, however, does not suggest that Recinos would have been viewed by the defendants in the same way as the undocumented victims at trial.  Recinos states that she had a college degree, previously worked for a company in Manhattan, and had purchased a house in 2007.  She does not indicate that she withheld any of this information from Rivera and his co-defendants.

Finally, given the overwhelming evidence presented at trial and discussed earlier, Rivera cannot establish that there is a reasonable probability that, if Obedin had called any or all of these employees as defense witness, that the outcome at trial would have been different.[22]

Accordingly, Rivera's ineffective assistance claims concerning these allegedly exculpatory witnesses fail.

Finally, the Court also finds that Rivera is not entitled to a hearing on this claim.

Section 2255(b) provides, in relevant part, that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b).  However, the "the filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing; that section does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible.'" Gonzalez v. United States, 722 F.3d 118, 130 (2d Cir. 2013) (quoting Machibroda v. United States, 368 U.S. 487, 495 (1962)).  A hearing is necessary only where the petition "set[s] forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief."  Id.

Even if some type of hearing is warranted, it is "within the district court's discretion to determine the scope and nature of a hearing."  Raysor v. United States, 647 F.3d 491, 494 (2d Cir. 2011) (citing Chang v. United States, 250 F.3d 79, 85–86 (2d Cir. 2001)).  Courts often "consider the 'trial record, letters, documents, exhibits, affidavits and written interrogatories' and may adopt a 'middle road' approach, declining to hold a hearing and 'deciding disputed facts on the basis of

---

[22]     Notably, at trial, Villaman called defense witnesses in an attempt to establish that no prostitution occurred at Sonidos.  Paul Newton testified that he never observed any prostitution despite allegedly spending hundreds of hours at Sondios.  Even after hearing those witnesses, the jury still convicted Villaman and Rivera on various charges including conspiracy to commit sex trafficking and substantive sex trafficking counts.

written submissions.'" Rosario v. United States, 2019 WL 5260784, at *3 (S.D.N.Y. Oct. 17, 2019)

(quoting Pham v. United States, 317 F.3d 178, 184 (2d Cir. 2003)).

With respect to Marino, Nunez, and Ventura, Obedin credibly explained that "none of these witnesses gave information that proved helpful to Mr. Rivera's case." Rivera has not submitted any contrary affidavits or notarized statements indicating what these witnesses would have testified to or what they told Obedin when he spoke with them in 2009. Moreover, interview notes for Ventura and Nunez confirm that there were ample strategic reasons for not calling these witnesses. Rivera is not entitled to a hearing with respect to these witnesses.

As for Colon, Fuentes, Marte, and Recinos, Petitioner has not offered evidence to establish that Obedin acted unreasonably in not interviewing these witnesses prior to trial. Rivera does not even claim that he ever identified Colon, Fuentes, and Recinos as potentially favorable witnesses. There is no evidence in the record indicating that the employees Obedin did speak with, such as Nunez and Ventura, should have led Obedin to believe that interviewing additional employees was likely to result in the discovery of credible exculpatory evidence. In fact, the interview notes of Ventura, Nunez, and other employees indicate that any such witnesses were more likely to harm, rather than help, Rivera's defense and that calling any employees as defenses witnesses at trial would have very risky. Furthermore, Obedin denies that any of the witnesses he spoke with had any information that would have been helpful to Rivera's case and unequivocally states that he was never made aware of Recinos's existence by Rivera or anyone on Rivera's behalf. (ECF No. 626.)

Given all the evidence in the record, Rivera has not alleged a plausible claim of ineffective assistance. Accordingly, the Court denies Rivera's ineffective assistance claim and related request for a hearing.

### 3. Failure to Move to Dismiss the Sex Trafficking and Forced Labor Conspiracy Counts Based on Sufficiency of the Evidence and the Ex Post Facto Clause

Construing Petitioner's next claim liberally and interpreting it as raising the strongest possible argument, it appears that Rivera alleges that Obedin was ineffective because he failed to seek dismissal of the sex trafficking and forced labor conspiracy counts based on alleged insufficiency of the evidence and purported violations of the Ex Post Facto Clause. Rivera argues that his conviction on the TVPRA conspiracy counts was based only on the conduct before December 23, 2008—the effective date of the TVPRA—and that, as such, these convictions were not supported by sufficient evidence. (Pet. at 30-37.)

Rivera's arguments appear to be based on his faulty, and frankly absurd, interpretation of the Superseding Indictment. The original Indictment charged Rivera with conspiring to commit sex trafficking and forced labor as to "Janes Does 1 through 5 and other Latin American women." (Indictment, ECF No. 25.) The Superseding Indictment slightly altered this language and now alleged conspiracies involving "the Latin American women." (Superseding Indictment, ECF No. 88.) Based on these differences in the two indictments, Rivera appears to assert that the "Latin American Women" referenced in the Superseding Indictment must be interpreted as to exclude the named Jane Does. (Pet. at 45.) He then proceeds to argue that the evidence concerning women who were not the named Jane Does only involved conduct that occurred prior to December 23, 2008. (Pet. at 34-37.) This argument and Rivera's absurd reading of the phrase "Latin American Women" are utterly meritless.

The Superseding Indictment broadly defined the term "Latin American women." (See Superseding Indictment ¶ 2 ("The defendants . . . recruited women who had entered the United States illegally from Latin America, some of whose identifies are known to the Grand Jury, (collectively, the 'Latin American women').") And, as the Government explains in their response,

36

Petitioner's argument rely on an incomplete snapshot of the evidence that came out at trial.  (Resp. at 9-10.)  Petitioner's criminal conduct extended from 2005 until August 2009.  At trial, not only the witnesses listed in Rivera's Petition testified, but the jury also heard, for example, from an undocumented immigrant from Guatemala named Cesia (Jane Doe 5) who testified that she worked at Petitioner's bar from 2007 until August 2009, when the bar was shut down by the Government.  (Trial Tr. at 1174-99.)  Cesia detailed her experience working for Petitioner, her interactions with him and his co-defendants, including the instances when she was made to have sexual intercourse in the basement of the bar and was groped by the patrons, her complaints to Petitioner and his response to her that it was "part of [her] job," as well as his instructions to her not to call the police because she was undocumented.  (Id. at 1176-77.)  Another victim, Jesse (Jane Doe 2), testified at trial that she was working at Petitioner's bar in 2009 and that the customers paid for sex with the waitresses inside the bar.  (Id. at 1271:11-12, 1283:10-23.)  A bartender from one of Petitioner's bars also testified that she began working for Petitioner in March 2009 and saw customers giving Petitioner money and then sexually touching waitresses.  (Id. at 284-300.)  She also described how Petitioner instructed her to take $200 from a patron who then went into the kitchen with a heavily intoxicated waitress whom the bartender later observed leaving the kitchen while "her hair was really messed up, her skirt was under, flipped, and she was pretty wasted."  (Id. at 312-13.)  There was more than sufficient evidence in the record to support the TVPRA conspiracy counts.

Petitioner also asserts that he must have been convicted based on pre-December 2008 conduct because during deliberations, the jury requested the testimony of two waitresses who Petitioner claims stopped working at his bars prior to December 2008.  Even assuming arguendo that Petitioner has correctly characterized the timing of their employment, this argument is still

meritless.  The mere fact that the jury requested this testimony does not establish that the verdict was improperly based on pre-enactment conduct.

Furthermore, "[i]t is well-settled that when a statute is concerned with a continuing offense," such as conspiracy, "the Ex Post Facto clause is not violated by application of a statute to an enterprise that began prior to, but continued after, the effective date of the statute."  United States v. Monaco, 194 F.3d 381, 386 (2d Cir. 1999).  "A conviction for a continuing offense straddling enactment of a statute will not run afoul of the Ex Post Facto clause unless it was possible for the jury, following the court's instructions, to convict exclusively on pre-enactment conduct."  Id. (emphasis in original) (internal quotation marks and citations omitted).

Rivera's argument that the jury convicted him solely based on pre-TVPRA evidence is pure speculation and does not give rise to a viable Ex Post Facto Claim.  Rivera has not shown that it "was possible for the jury, following the court's instructions, to convict exclusively on pre-enactment conduct."  Monaco, 194 F.3d at 386.  Notably, Petitioner does not even point to any flaws in the jury instructions on this point.  Given the evidence at trial as well as the jury instructions given by Judge Feuerstein—which clearly charged that the TVPRA counts concerned conduct during the time period between December 23, 2008 and August 10, 2009, (Trial Tr. at 2121:1-13)—Rivera's speculative claim that the jury convicted him solely on pre-enactment conduct is patently insufficient to establish an Ex Post Facto claim.  See Monaco, 194 F.3d at 386.

Given that both arguments set out above are patently meritless, counsel was not ineffective for failing to raise them.

Finally, Petitioner's arguments about Jasmin Rivera's guilty plea and her testimony at trial, (Pet. at 30–32), also do not establish that Petitioner was convicted based on pre-enactment conduct.  Nor has Petitioner established that Obedin was ineffective for not probing, during Jasmin Rivera's

38

testimony, whether she conspired with Petitioner after December 2008.  The evidence at trial made

clear that she did.  Jasmin Rivera was involved with the Petitioner and the bars from their opening

until the Government's raid in August 2009.  (See, e.g., Trial Tr. at 706-07.)  The fact that Jasmin

Rivera, who cooperated with the Government, was allowed to plead guilty to only certain lesser

charges has little probative value given the evidence against Petitioner adduced at trial.

Therefore, the ineffective assistance claims discussed above are all meritless.

### 4. Failure of Appellate Counsel to Raise the <u>Elonis v. United States</u> Decision before the Second Circuit

Petitioner asserts that his appellate counsel, John Carman, was ineffective because, during

the pendency of the first appeal, Carman did not brief the Second Circuit on the purported

applicability of the Supreme Court's decision in <u>Elonis v. United States</u>, 575 U.S. 723 (2015), to

Rivera's case.  (Pet. at 18-21.)  Specifically, Petitioner argues that Judge Feuerstein's jury

instructions on the sex trafficking conspiracy count (Count 14) and forced labor conspiracy count

(Count 17) were inconsistent with the <u>Elonis</u> decision.  (Id.; Reply at 7-8.)  Petitioner claims that,

had Carman raised <u>Elonis</u> before the Second Circuit, the outcome of the appeal would have been

different.  (Pet. at 18-21.)

18 U.S.C. §§ 1594 (b) and (c) make it a crime to conspire with others to violate 18 U.S.C.

§ 1589 (forced labor) and § 1591 (sex trafficking) respectively.

The Forced Labor Statute, 18 U.S.C. § 1589, states:

(a) Whoever <u>knowingly</u> provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of <u>serious harm</u> or threats of <u>serious harm</u> to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer <u>serious harm</u> or physical restraint,

shall be punished as provided under subsection (d).

(b) Whoever <u>knowingly</u> benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), <u>knowing or in reckless disregard</u> of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

18 U.S.C. § 1589 (emphasis added).

The Sex Trafficking Statute, 18 U.S.C. § 1591, states:

(a) Whoever <u>knowingly</u>—

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

<u>knowing</u>, <u>or</u>, except where the act constituting the violation of paragraph (1) is advertising, <u>in reckless disregard</u> of the fact, that means of force, threats of force, fraud, <u>coercion</u> described in subsection €(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591 (emphasis added).  Section 1591 defines "coercion" to include:

(A)    threats of serious harm to or physical restraint against any person;

40

      (B)      any scheme, plan or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

      (C)      the abuse or threatened abuse of law or the legal process.

18 U.S.C. § 1591(e)(2).

    In his first appeal, Petitioner challenged the jury instruction's explanation of the "serious harm" element for these counts.  (United States v. Rivera, No. 13-3722 (2d Cir.), ECF. No. 109 at 22-30.)  Rivera argued that Judge Feuerstein's instructions at trial were erroneous because they relied on a "purely subjective" standard in defining "serious harm."  (Id.)  The Second Circuit concluded that the jury instructions on the sex trafficking charges indeed improperly emphasized the subjective component of "serious harm."  See Rivera, 799 F.3d at 186-87.  It further explained that the "correct standard is a hybrid: it permits the jury to consider the particular vulnerabilities of a person in the victim's position but also requires that her acquiescence be objectively reasonable under the circumstances."  Id.  The Second Circuit, however, held that, given the evidence at trial, this error was "harmless beyond a reasonable doubt."  Id. at 187.  Regarding the allegation that the same erroneous instruction was provided on the forced labor counts, the Second Circuit found that argument meritless as the charging statute contains the same definition that Judge Feuerstein provided to the jury.  See id. at 187 n.5; see also 18 U.S.C. §§ 1589(a)(2), (c)(2) (defining "serious harm" as what "a reasonable person of the same background and in the same circumstances" would consider as such).

    Petitioner now claims that the Second Circuit's analysis of this jury instruction error would have been different had his appellate counsel briefed the court on the Supreme Court's decision in Elonis v. United States, 575 U.S. 723 (2015), which came down about three months before the Second Circuit's decision of his first appeal.  (Pet. at 18-21.)  Petitioner insists that Elonis is

relevant to the jury instructions on the sex trafficking and forced labor counts.  (Pet. at 18-21.)  This argument is meritless.

Petitioner's argument based on the applicability of Elonis fails as Elonis is irrelevant to the interpretation of 18 U.S.C. §§ 1589 and 1591.  In Elonis, the Supreme Court addressed the question of what mens rea requirement should be read into 18 U.S.C. § 875(c), a statute that criminalizes the transmission of interstate threats, but does not contain a mens rea element.  See Elonis, 575 U.S. at 741.  In that case, the Supreme Court held that it was improper to instruct the jury that the defendant's mens rea was governed by a reasonable person negligence standard because, as the Court concluded, a more demanding mens rea must be read into 18 U.S.C. § 875(c).[23]  Even if Elonis' holding may have relevance to some other statutes beyond 18 U.S.C. § 875(c), it has no relevance here.  Unlike the statute in Elonis, the forced labor and sex trafficking statutes, 18 U.S.C. §§ 1589 and 1591—which Rivera was convicted of violating and conspiring to violate—both include explicit mens rea requirements.  See 18 U.S.C. §§ 1589 (a) and (b), 1591 (a).  Moreover, Judge Feuerstein's charge to the jury incorporated these relevant statutory mens rea requirements.  (Trial Tr. at 2121-33.)  Elonis—which involved a statute that did not include a mens rea element— is simply irrelevant to the sex trafficking and force labor statutes at issue here.[24]  Cf. McKinley v. United States, No. 14-60163-CR, 2018 WL 10357267, at *9 (S.D. Fla. Feb. 9, 2018) (rejecting a challenge to sex trafficking jury instruction based on Elonis).  Therefore, counsel's failure to make a meritless argument before the Second Circuit was not a deficient performance and did not affect

---

[23]    The Court in Elonis did not decide the question of what exactly this more demanding mens rea requirement should be and whether recklessness was sufficient. See Elonis, 575 U.S. at 741.

[24]    Elonis addressed only the mens rea element of § 875(c).  In Rivera's appeal, the Second Circuit, in considering the claim of instructional error, addressed the appropriate standard for determining when "serious harm" is established for purposes of the TVPRA sex trafficking and forced labor statutes.  The issue before the Second Circuit had nothing to do with mens rea, and Rivera's attempt to connect Elonis to the instructional error identified by the Second Circuit on appeal is unavailing.

42

the outcome of the case. See Aparicio v. Artuz, 269 F. 3d at 99 ("The failure to include a meritless argument does not fall outside the 'wide range of professionally competent assistance' to which Petitioner was entitled." Jameson v. Coughlin, 22 F. 3d 427, 429-30 (2d Cir. 1994) (quoting Strickland, 466 U.S. at 690)). This claim fails on both Strickland prongs.

### 5. Claim of Ineffective Assistance Based on the Alleged Constructive Amendment of the Indictment

Finally, Petitioner claims that both trial and appellate counsel were ineffective for not seeking a dismissal based on what Petitioner alleges were constructive amendments of the Superseding Indictment. (Pet. at 38-51.) This argument is meritless. Petitioner cannot show how he was prejudiced by the counsels' failure to make what would have been a futile and frivolous motion. Therefore, his claim fails on both Strickland prongs.

The Petition lists instances where the language of the Superseding Indictment allegedly diverges, in some fashion, from the statutory language and the provided jury instructions. (Id. at 38-51.) Rivera misleadingly asserts that the Superseding Indictment failed to allege "essential elements as required" and did not provide him proper notice of charges against him. (Id.) However, looking at these alleged discrepancies makes it clear that, while the language of the Superseding Indictment, applicable statutes, and jury instructions did not exactly match, the discrepancies highlighted by Rivera are minor and involve syntax rather than substance.

Initially, Petitioner conflates two legal arguments. He alleges that the Superseding Indictment omitted "essential elements" of the charged crimes and that there was a "constructive amendment" of the Superseding Indictment at trial. An appropriate time to move based on the defects in the Superseding Indictment would have been pre-trial, while an occurrence of the constructive amendment would become clear only after the evidence was presented at trial.

"To prevail on a constructive amendment claim, a defendant must demonstrate that 'the

terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'" United States v. D'Amelio, 683 F.3d 412, 416 (2d Cir. 2012) (quoting United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988)).  There are "two constitutional requirements for an indictment: first, that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  Id. at 416-17 (quoting United States v. Resendiz-Ponce, 549 U.S. 102, 108 (2007) (internal quotation marks, brackets, and citations omitted)).  While the constructive amendment constitutes a per se reversible violation, the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial."  United States v. Rigas, 490 F.3d 208, 228 (2d Cir. 2007) (internal quotation marks, emphasis and citation omitted).

While Petitioner does not address the issue of the evidence presented at trial, he claims that the jury instructions were broader than the indicted counts. This claim is meritless.  Rivera speculates that the grand jury "could not find that Rivera had direct knowledge of committing the offenses" and this is why the word "knowingly" was omitted from the language of the Superseding Indictment on the sex trafficking and forced labor conspiracy counts (Counts 14 and 17).  (Pet at. 49-50.)[25]  This is, however, an incorrect and misleading description of the charges in the Superseding Indictment.  Count 14 of the Superseding Indictment (sex trafficking conspiracy) charged that Petitioner had "knowingly and intentionally conspire[d] to (a) recruit, entice, harbor,

---

[25]      In his Reply, Rivera points out that the Government did not address the claims concerning Counts 22 through 36 (substantive and conspiracy counts of transporting and harboring aliens).  (Reply at 6).  However, in the Petition, Rivera does not raise any issues with respect to these specific counts of the Superseding Indictment, and therefore, the Court need not address this argument any further.

transport, provide, obtain and maintain one or more persons [to engage in commercial sex acts'
and (b) benefit, financially and by receiving things of value, from participation in a venture which
engaged in one or more such acts  . . . ."  (ECF No. 233 ¶15.)  The relevant statute, 18 U.S.C. §§
1591(a)(1) and (b)(2), is structured in a way that "knowingly" precedes subparagraphs (a) and (b),
and therefore, Petitioner asserts, the word "knowingly" should have been repeated before (a) and
(b) subparagraphs of the Superseding Indictment as well.  (Pet. at 39-40.)  However, such minor
discrepancies in how the charges were written in the Superseding Indictment do not alter the fact
that knowledge was a required element in the superseding indictment, as it is in the statute, and as
the Court appropriately instructed the jury.[26]

Petitioner further maintains that the indictment was constructively amended because the
Superseding Indictment did not include the phrase "or physical restraint" for the forced labor
conspiracy counts under 18 U.S.C. § 1589(a)(4) even though that phrase is in the statute and was
included in the jury charge, (see Trial Tr. at 2125).  (Pet. at 41-45.)  This argument is meritless as
well.

The Forced Labor Statute, 18 U.S.C. § 1589, states:

(a) Whoever knowingly provides or obtains the labor or services of a person
by any one of, or by any combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats
of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that
person or another person;

(3) by means of the abuse or threatened abuse of law or legal
process; or

(4) by means of any scheme, plan, or pattern intended to cause the
person to believe that, if that person did not perform such labor or

---

[26]     Petitioner makes the same meritless argument regarding counts 17 (forced labor conspiracy) and 18 through
21 (substantive forced labor).  (Pet. at 41-44.)

> services, that person or another person would suffer serious harm or
> physical restraint,
>
> shall be punished as provided under subsection (d).

18 U.S.C. § 1589 (emphasis added).

> The Superseding Indictment charged Rivera and his co-defendants with conspiring to:
>
> (a) provide and obtain the labor and services of persons, to wit: the Latin American women, by means of (i) force, threats of force, physical restraint and threats of physical restraint to those persons and other persons, (ii) serious harm and threats of serious harm to those persons and other persons, (iii) the abuse and threatened abuse of law and legal process, and (iv) a scheme, plan and pattern intended to cause those persons to believe that, if they did not perform such labor and services, those persons and other persons would suffer serious harm, and (b) benefit, financially and by receiving things of value, from    participation  in  a  venture which had engaged in the providing and obtaining of labor and services by any of such means, knowing, and in reckless disregard of the fact, that said venture had engaged in the providing and obtaining of labor and services by any of such means, contrary to Title 18, United States Code, Section 1589 (2009).

(Superseding Indictment ¶ 19 (emphasis added).)

Rivera seizes on the indictment's failure to include the "or physical restraint" language from § 1589(a)(4).   However, the omission of this language from the indictment was not a constructive amendment given that the Superseding Indictment tracked the statutory language and explicitly referenced "physical restraint and threats of physical restraint" as in § 1589(a)(1).  See United States v. Mickey, 897 F.3d 1173, 1183 (9th Cir. 2018) (finding that similar omission of certain statutory language from the indictment charging sex trafficking under 18 U.S.C. § 1591 did not constitute a constructive amendment and stressing that defendant could not "show prejudice" as the "terms of the statute were well known and there is not a credible argument that [defendant] would have approached his defense any differently" had the indictment included the omitted language).  The Superseding Indictment gave Rivera notice of the core of criminality to be proven and this omission did not "so modify essential elements of the offense charged that there

is a substantial likelihood that" he "may have been convicted of an offense other than that charged in the indictment."   D'Amelio, 683 F.3d at 416; see also Morgan, 2024 WL 747904, at *1 ("Ultimately, the essential inquiry is whether the deviation between the facts alleged in the indictment and the proof underlying the conviction undercuts the constitutional requirements of the Grand Jury Clause: allowing a defendant to prepare his defense and avoid double jeopardy" (internal quotation marks and citations omitted)).

Petitioner's trial and appellate counsel were not ineffective for failing to bring meritless motions or arguments without a reasonable chance of success.   Relatedly, because any such motions were futile, Petitioner was also not prejudiced by counsels' failure to pursue these arguments.   Therefore, this claim fails on both Strickland prongs.

### III.   CONCLUSION

For the foregoing reasons, Rivera's Petition is DENIED.   It is further ordered that the Clerk of the Court mark this case and the corresponding civil case, Case No. 19-cv-05836, closed.   The Court further declines to issue a certificate of appealability because Petitioner has not made a substantial showing that he was denied a constitutional right.   See 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

Dated:   August 29, 2024
        Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE

47